IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:09CR3023 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM AND ORDER** |
| MATTHEW A. CAMPBELL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Sometimes, judges should actually look at the child pornography that forms the basis for a conviction before fashioning an appropriate sentence. *See*, *e.g.*, *United States v. Cunningham*, 680 F. Supp. 2d 844, 854-855 (N.D. Ohio 2010) ("Thus, the Court implores any reviewing Court to personally examine the images at issue and not simply rely on a written description of their contents. The Court acknowledges that the review of such images is, to say the least, uncomfortable. There are some images that are haunting, and they cannot be unseen. However, any uneasiness felt by the individual reviewing the image pales in comparison to the harm caused by the image being created in the first place. The image '004.jpg' does in fact depict a prepubescent female engaged in sex with an adult male. That written description cannot convey the true nature of the image. The image depicts a little girl, likely no more than eight years old. She has a vacant look to her eyes, as if even at her tender age, she understands the cruelty of the event taking place and the impact it will have on her for the rest of her life. . . . One cannot describe in writing that image. Rather, one has to see the dull, often vacant expressions of the victims to get an ounce of the proper emotions expressed in those images."); *United States v. Fiorella*, 602 F. Supp. 2d 1057, 1075 n.8 (N.D. Iowa 2009) ("It is easier to overlook the horrors of child pornography when, as is often the case, the material at issue is not presented to the sentencing judge. For purposes of efficiency and minimization of re-victimization of

the children depicted, the government and the defendant will often (and rightly so) enter into stipulations about the number and nature of the photographs at issue. But the horrors of child pornography are real even if those who sit in judgment do not have occasion to view them.").

As I can personally attest, viewing the typical images involved in these cases will flail a judge's soul. *See*, *e.g*, *United States v. Grant*, 434 F. Supp. 2d 735, 744 (D. Neb. 2006) ("For example, the video numbered '0004.avi' was indexed in Grant's computer with words ending in 'mace 6yo fuck ilègal.avi.'. . . The video begins with the following words flashed on the screen: 'Daddy and Me at 6.' The video shows an adult male having sexual intercourse with a very young girl, perhaps six years of age. Replete with a close up, it shows the adult male's penis in the child's vagina. Sadly, the images do not appear to be animations, but rather appear to actually record the rape of a very young girl.").

But, a careful review of the images involved here[1] has made me pause. This stuff, while cancerous, does not appear to be of the metastatic variety that is the norm. To be specific, the evidence the government relies upon[2] does *not* involve

---

[1]Every image was reviewed in my chambers using a chart developed in an effort to rationally categorize the depictions and in the hopes of assessing the relative harm to the victims. Counsel have been provided with copies of the completed chart.

[2]There were other images seized from the defendant's computer and, like all the others, those were reviewed in my chambers. After that review, I held a conference in chambers with the prosecutor and defense counsel because I had questions about precisely what images the government was relying upon. The government advised me at that conference and in a letter that for some of the images, potentially involving prepubescent minors, the government cannot prove and therefore does not contend that the defendant knowingly possessed them. (Filing 92.) This is consistent with the statement in the presentence report that "[a]ccording to [the] AUSA . . . and the case agent, none of the images were prepubescent minors." (PSR ¶ 13.) Regarding three very short videos (241246.wmv, 532990.avi and 180312.mpg) showing, among other

prepubescent minors or children under the age of 12, and it does *not* involve teenage girls performing sex acts on themselves or others.  In other words, there is no intercourse, fellatio, cunnilingus or masturbation shown.  The material *does* involve young girls between the approximate ages of 13 and 15 behaving in a libidinous manner and lasciviously exposing themselves.  Compared to most other federal child pornography cases, the depictions involved in this case are unusual from a quantitative viewpoint.[3]  These images are also *relatively* tame from a qualitative point of view.

Because of the nature and circumstances of the offense, the history and characteristics of the defendant, and for other relevant statutory reasons, I am inclined to grant the defendant's motion for variance and impose a probationary sentence of five years.  If I vary, the terms of probation will be demanding and are likely to include a fine of $7,500 and placement of up to 120 days in a community confinement center (*see* U.S.S.G. § 5F1.1), to be followed by six months of home confinement (*see* U.S.S.G. § 5F1.2) under electronic monitoring, together with 100 hours of community service.  Of course, Campbell will be required to register under Nebraska's new and onerous sex offender registration statutes[4] and hew the line on various other restrictions (*see* particularly U.S.S.G. § 5B1.3(d)(7), p.s.) that I will impose.

_____

things, sexual intercourse between adult males and sexually well-developed females, the government advised that it would not attempt to prove that the participants were minors and, in a letter (filing 97), the government confirmed this concession after discussing that matter with the FBI analyst who reviewed the images.  Thus, for purposes of sentencing, the relevant universe of images, and the character of those images, is as described in the text.

[3]The prosecutor candidly agreed that he "could count on one hand" the number of child pornography prosecutions in this court that did not involve prepubescent minors.  (Filing 96 at CM/ECF p. 25.)  More about that later.

[4]I am intimately familiar with the new law, as I am handling the constitutional challenges to it.  *See*, *e.g.*, *Doe v. Nebraska*, No. 8:09CV456, 2009 WL 5184328 (D. Neb. 2009) (describing Nebraska's new sex offender registration laws).

My decision is tentative.  I will, of course, hear the parties at the final sentencing hearing.  I offer this preliminary opinion in advance so the lawyers can be prepared to tell me why I am wrong.

While such a variance is atypical, there are several opinions of the Courts of Appeal (although not in the Eighth Circuit) that hold in relatively comparable child pornography cases that such a sentence is *not* an abuse of discretion.  *See*, *e.g.*, *United States v. Autrey*, 555 F.3d 864 (9th Cir. 2009) (in a child pornography case, affirming five-year probationary sentence where the Guidelines range was 41 to 51 months); *United States v. Duhon*, 541 F.3d 391 (5th Cir. 2008) (in a child pornography case, affirming five-year probationary sentence where the Guidelines range was 15 to 21 months); *United States v. Rowan*, 530 F.3d 379 (5th Cir. 2008) (in a child pornography case, affirming five-year probationary sentence where the Guidelines range was 46 to 57 months).  *Cf.*  *United States v. Lehman*, 513 F.3d 805 (8th Cir. 2008) (in a case charging the defendant with being a felon in possession of a firearm, where one of the defendant's children died from a self-inflicted gunshot wound involving the gun possessed by the defendant, affirming a probationary sentence with a community corrections component where the Guidelines range was 37 to 46 months; one of the surviving children had Asperger's disorder, as in this case).

I acknowledge that a variance like the one I am contemplating is at the outer margins of the appropriate exercise of my discretion, and I confess to some doubt about the propriety of leniency.  That freely admitted, I next explain the reasons for a probationary sentence.

## I.  BACKGROUND

Eastern Europe has become a cesspool awash in the production and distribution of child pornography.  Campbell purchased videos produced in this part of the world

from an Internet site.[5]  Unfortunately for Campbell, that site was the subject of an extensive investigation by Europol[6] under the code name "Koala."  This case demonstrates the laudable efforts of law enforcement to do something concrete about international child exploitation, including the exploitation that comes with child pornography.  Nothing I write is intended to deter or criticize these law enforcement efforts.

To be specific, in 2005 and 2006, Campbell purchased several videos.[7]  One video cost Campbell $31.00.  I cannot determine the cost of the other videos, but I assume they cost about the same amount as the one video for which we have cost evidence.  He either sent the money electronically or authorized a charge to his credit card.  After he paid, Campbell was provided with a link that allowed him to download the material to his computer.

---

[5]The videos which have been loaded onto discs together with other sensitive materials, especially including the investigative reports, are contained in a paper file held by the Clerk of Court and referenced as an attachment to filing 92.  None of those documents have been uploaded to CM/ECF.  The discs should be viewed on a computer loaded with the necessary software.  For my review, the government provided me with such a computer.

[6]Europol is an acronym for the "European Law Enforcement Agency."  Its mission is to assist national law enforcement authorities in the fight against serious forms of organized crime.  *See Europol*, http://www.europol.europa.eu (click on "Europol Overview").

[7]*See* Attachment 4 to Filing 92 consisting of FBI correspondence regarding an investigation named "Koala"; Attachment 5 to Filing 92 consisting of a series of e-mails from Campbell to the pornography site; and Attachment 7 to Filing 92 regarding a Europol "Intelligence Report."  I assume that Campbell purchased each of the 13 videos for which he has been held accountable, although the evidence is vague about how many videos were actually purchased.

It is clear from the Europol report that these pornographers were engaged in a large international scheme to distribute child pornography using the Internet. Clearly, this was a big and well-organized criminal enterprise.

Following receipt of the report from Europol, an FBI agent and a Nebraska Highway Patrol investigator went to Campbell's home on September 23, 2008. (Ex. 102, FBI Interview Report (transcription date Sept. 26, 2008).) They did not have a search warrant, but Campbell let them in and allowed them to search his computer and related devices.[8] When the agents were at the home, Campbell also admitted to possessing child pornography. Among other things, he advised that the videos contained "'girls (13-16 years old) who were partially clothed in a T-shirt and bikini bottoms. Some of the videos were of only one girl, while others contained two young girls dancing around together to 'bad music.'" (Ex. 102, FBI Interview Report at 2 (transcription date Sept. 26, 2008).) Campbell's description of the images downplayed the state of undress and the lewdness of the behavior depicted. That said, Campbell's admissions are roughly consistent with my review of the images.

*The Images*

My review of the images establishes, and I find as fact, that the images upon which the government relies (1) do *not* involve prepubescent minors or children under the age of 12 and (2) do *not* involve young girls performing sex acts on themselves or with others. In other words, there is no intercourse, fellatio, cunnilingus or masturbation shown. There is also no sadism, masochism, bestiality or other perversions depicted. The material does involve young girls between the approximate

---

[8]Campbell later claimed that his consent was not voluntary because his fiance, the fiance's two male children and Campbell's mother were in the home when the law enforcement agents came to the home and because the agents assured him they would be quick and discrete if Campbell cooperated in the search. I denied his motion to suppress. In fact, the agents behaved humanely and with tact and proper decorum.

ages of 13 and 15 behaving in a libidinous manner and, at times, lasciviously exposing themselves, including their genitalia.   As a result, there is no question that the materials upon which the government relies satisfies the legal definition of child pornography.

For example, and concentrating on the videos, 52341.avi involves three nude females moving and posing in a sexually explicit manner; 548659.avi involves two nude females moving and posing in a sexually explicit manner; 53862.avi involves two nude females behaving lewdly in a bath tub; 532888.avi involves two nude females behaving lewdly on a counter top; 532852.avi involves two nude females behaving lewdly on a bed; 532850.avi involves two nude females behaving lewdly on chairs; 722220.avi involves two nude females moving in a sexually explicit manner and touching each other's genitalia; 806346.avi involves a nude female moving and posing in a sexually explicit manner; 764155avi involves two partially clothed females behaving lewdly; 707159.avi involves a female partially clothed and behaving lewdly; 710425.avi involves a female partially clothed and behaving lewdly; and 721740.avi involves a female partially clothed and behaving lewdly.   The still images are similar.

Using a chart similar to the one I used, the Europol investigators categorized the images subject to "Operation Koala."   (*See* Filing 92, Attach. 7, Europol Intelligence Report & Chart 1-13.)  While that chart evaluates many more (and more degrading) images than are involved in this case[9], to the degree that the Europol chart evaluates the same images, that chart is consistent with my own analysis.   For example, the Europol chart gives the following description of one of the videos in this case: "One minor female wearing a sheer thong and loose fitting bra.  Camera focuses on genital area, buttocks and anus.  Breast exposed."  (*Id.* Chart at 6, under file name

---

[9]The Europol report does not pertain to specific purchasers like Campbell.

"N15.avi" and video title "N.[redacted]#15.")  That description is consistent with my own analysis.

In some of the videos, the first names and ages of the girls are mentioned.  The titles are "V. and K. #3: 13 Years Old," "N. #24: 13 Years Old," "N. #15: 13 Years Old" and "N. # 20: 13 Years Old."[10]  Campbell could not have misunderstood that he was purchasing materials that depicted the victimization of young teenage girls.[11]  To be fair, however, Campbell has never made a claim that he was mistaken.  In fact, without a warrant, he allowed law enforcement officers into his home to conduct a search, and then he promptly admitted his guilt to the investigators.

*The Prosecution, the Polygraph and the Psychologists*

On February 19, 2009, Campbell was indicted and charged with two substantive counts.  (Filing 1.)  Count I alleged knowing receipt of child pornography in violation of 18 U.S.C. § 2252(a)(2).  Count II alleged knowing possession of child pornography in violation of 18 U.S.C. 2252(a)(4)(B).   The government has never alleged, and the government does not claim, that Campbell distributed child pornography by trading it or otherwise.

The defendant was summoned (filing 5) to court and then released under electronic monitoring after a report from a Pretrial Services officer.  (Filings 9, 18.) The electronic monitoring condition was later lifted.  (Filings 28, 34, 35.)  Shortly

───────────────

[10]Using only the first initials, I redacted the names of the girls.

[11]Sadly, there is also some reason to believe that adult family members of some of the girls may have played a role in their victimization.  (See Filing 92, Attach. 7, Europol Intelligence Report 5-17, stating that an associate of the target "arranged interviews for the girls *and their parents*" (emphasis added) and further observing that mothers, fathers, grandmothers and other family members sometimes accompanied the girls.)

before the first sentencing hearing, a Pretrial Services officer reported that Campbell had "fully complied with all conditions of release to date." (Filing 87.)

As a condition to the government accepting a plea to the possession charge, as opposed to the more serious crime of receipt which carried with it a statutory minimum sentence of five years, the government demanded that Campbell (1) submit to a polygraph examination to ensure that he had not had sexual contact with any minors; (2) submit to a psychological evaluation at his expense; (3) comply with any treatment recommendations; and (4) provide the government with a copy of the evaluation. (Ex. 102, E-mail from Prosecutor to Defense Counsel (Dec. 29, 2009).) Campbell complied.

Campbell took a polygraph administered by a Nebraska Highway Patrol investigator and he passed. In particular, Campbell was asked "whether or not he had any sexual contact with a minor under the age of 16 since the time he turned 19 yoa. The result of the exam was 'No Deception Indicated' to the relevant questions asked of him." (Ex. 102, E-mail from Prosecutor to Defense Counsel forwarding results of polygraph (Feb. 23, 2010).) The investigator asked a "control" question about whether Campbell had lied to law enforcement about "anything." Campbell began the interview (before administration of the polygraph) by stating "no." However, during the administration of the polygraph when asked that same "control" question, he stated "yes." Campbell explained that he had earlier lied to law enforcement officers when they asked whether he had masturbated while viewing these materials.

After two sessions with Steven B. Blum, Ph.D., a licensed clinical psychologist, Dr. Blum advised defense counsel that "it is my clinical opinion that he is a low risk for any sexual inappropriate behavior. In particular, I do not see any indication of any attractions to adult or minor males, and thus, I see no reason to limit his contact with the two male children of his significant other." (Ex. 102, Letter (Apr. 13, 2009).) Dr. Blum came to these conclusions in part because Campbell had a stable relationship

and a history of job stability, and because Campbell had no criminal record, there was no indication that Campbell had molested minors, there was no indication of psychopathy or poor impulse control and there was no substance abuse.

A much more thorough evaluation was conducted by A. Jocelyn Ritchie, a very well-qualified forensic psychologist who was also trained as a lawyer.[12]  (Ex. 102, Evaluation dated Jan. 18, 2010 (consisting of seven pages); filing 100 (supplement)). The doctor administered the Personality Assessment Inventory (PAI).[13]  Campbell provided a valid profile with no attempt to fake good or bad.  His scores fell in the normal range.  Dr. Ritchie also administered the Hare Psychopathology Checklist.[14]

---

[12]Doctor Ritchie received a Ph.D. in experimental psychology and a J.D. in the University of Nebraska-Lincoln psychology and law program.  She worked for several years as an advocate and legislative lobbyist for Nebraska's federally funded protection and advocacy agency before re-training in the UN-L clinical psychology program.  She was a post-doctoral Fellow in the Yale Psychiatry Department in forensic and neuropsychological assessment.  Upon returning to Lincoln she accepted an adjunct position in the UN-L Clinical Psychology Training Program, where she is active in teaching, research and clinical supervision.  She practices and consults in several agencies in the Lincoln area, including the Lincoln Regional Center, the VA and the Child Guidance Center. Her interests include forensic and neuropsychological assessment, assessment and treatment of trauma-related problems, psychiatric rehabilitation and mental health policy. *Serious Mental Illness Research Group* (University of Nebraska-Lincoln), http://www.unl.edu/dsc/ritchie. htm.

[13]"The Personality Assessment Inventory (PAI) provides information relevant for clinical diagnosis, treatment planning and screening for psychopathology," and "[v]alidity studies demonstrate the convergent and discriminant validity of PAI scales with more than 50 other measures of psychopathology."  Leslie C. Morey, Ph.D., *Personality Assessment Inventory* (1991), http://www.sigmaassessmentsystems.com (search for "Personality Assessment Inventory" under "Clinical/Counseling Assessments").

[14] "The Hare Psychopathy Checklist-Revised (PCL-R) is a diagnostic tool used to rate a person's psychopathic or antisocial tendencies. . . .  Originally designed to assess people accused or convicted of crimes, the PCL-R consists of a 20-item

-10-

Campbell's score of two was well below the cutoff of 30 for psychopathology. The doctor also administered the Sexual Violence Risk-20 assessment instrument.[15] Campbell was at a "low risk" according to that instrument.

Based upon the entirety of the doctor's examination and as explained in the evaluation, Dr. Ritchie concluded that Campbell "is at low risk to act out in any sexually inappropriate ways . . . ." She also concurred with the conclusions of Dr. Blum.

I view the polygraph results and the extensive forensic evaluation to be highly important. That is because there is research suggesting that Internet offenders are significantly more likely than not to have sexually abused a child via a "hands-on act." *See* Michael L. Bourke & Andres E. Hernandez, *The "Butner Study" Redux: A Report*

---

symptom rating scale that allows qualified examiners to compare a subject's degree of psychopathy with that of a prototypical psychopath. It is accepted by many in the field as the best method for determining the presence and extent of psychopathy in a person." *Encyclopedia of Mental Disorders*, http://www.minddisorders.com (search for "Hare-Psychopathology-Checklist").

[15]"The SVR-20 provides a structure for reviewing information important in characterizing an individual's risk of committing sexual violence . . . . The content of the SVR-20 was developed following a comprehensive review of similar instruments and of the scientific literature on risk for sexual violence and re-offense." *Encyclopedia of Mental Disorders*, http://www.minddisorders.com (search for "Sexual Violence Risk-20").

*of the Incidence of Hands-on Child Victimization by Child Pornography Offenders*, 24 J. Fam. Violence 183 (Apr. 2009) ("This study compared two groups of child pornography offenders participating in a voluntary treatment program: men whose known sexual offense history at the time of judicial sentencing involved the possession, receipt, or distribution of child abuse images, but did not include any 'hands-on' sexual abuse; and men convicted of similar offenses who had documented histories of hands-on sexual offending against at least one child victim. The goal was to determine whether the former group of offenders were 'merely' collectors of child pornography at little risk for engaging in hands-on sexual offenses, or if they were contact sex offenders whose criminal sexual behavior involving children, with the exception of Internet crimes, went undetected. Our findings show that the Internet offenders in our sample were significantly more likely than not to have sexually abused a child via a hands-on act. They also indicate that the offenders who abused children were likely to have offended against multiple victims, and that the incidence of 'crossover' by gender and age is high.").[16]

The authors of that article were employed by the United States Marshals Service and the Psychology Services Department of the Federal Correctional Institution, Butner, North Carolina. The views expressed in the article are those of the authors. They do not necessarily represent the views of the government.

While I have questions about the scientific validity of the research mentioned above and therefore question the conclusions of the article, the findings of the article are cause for caution. I have seriously considered whether Campbell is a risk for "hands-on" child abuse and firmly find and conclude that he is not such a risk. In particular, the polygraph and the forensic evaluation ameliorate legitimate concerns about "hands-on" sexual abuse by Campbell. In fact, the government accepted the results of the polygraph and the evaluations and agreed to allow Campbell to plead

---

[16] An abstract of the article is available at:
http://www.springerlink.com/content/c313832g17rt2850.

guilty to one count of possession of child pornography.  I accepted his plea and the case proceeded to sentencing.

*The Presentence Report and the Person*

A revised presentence report (PSR) was prepared.  It is in the record.  (Filing 93.)

Because the offense conviction was possession of child pornography, as opposed to receipt of child pornography or distribution, the base offense level was 18.  (PSR ¶ 19 (citing U.S.S.G. § 2G2.2(a)(1)).)  Because a computer was involved, Campbell received an additional two points.  (PSR ¶ 20.)  Using an estimation method required by the Sentencing Commission that treats each of the 13 videos as having 75 images and adding eight still images, Campbell was held responsible for 983 images (PSR ¶ 13) and his base offense level was therefore enhanced by five levels.  (PSR ¶ 21.)  Subtracting three points for acceptance of responsibility, Campbell's total offense level was 22.  (PSR ¶ 29.)  Campbell had zero criminal history points, so his criminal history category was I.  (PSR ¶ 33.)  In fact, the defendant's only criminal conduct consisted of being cited and fined for improper registration and violation of an automatic traffic signal.  (PSR ¶ 32.)

Campbell faces a statutory range of zero to ten years for imprisonment purposes (PSR ¶ 55), and his Guidelines imprisonment range is 41 to 51 months.  (PSR ¶ 57.)  With a statutory range of five years to life for purposes of supervised release (PSR ¶ 59), the supervised release range under the Guidelines is a flat five years.  (PSR ¶ 60.)  Statutorily, Campbell is eligible for probation with a term of between one and five years.  (PSR ¶ 61.)  He is not eligible for probation under the Guidelines.  (PSR ¶ 62.)  Under the Guidelines, the fine range is $7,500 to $75,000.  (PSR ¶ 65.)  Also, Campbell's computer equipment will be forfeited to the government as a result of the conviction.  (PSR ¶ 56.)

-13-

Campbell is 44 years of age.  ([PSR] ¶ 38.)  He was raised in Nebraska and Indiana.  ([PSR] ¶ 38.)  He has resided in Lincoln, Nebraska, since 1983.  ([PSR] ¶ 38.)  Refreshingly, Campbell reported that he "would not change anything about his childhood."  ([PSR] ¶ 41.)  He remains "very close" to his mother and his father and his one sibling.  ([PSR] ¶¶ 39, 40, 42.)  He has been married twice.  ([PSR] ¶ 43.)  He is currently married to Jennifer, and his wife has no prior criminal record or history of drug or alcohol abuse.  ([PSR] ¶ 43.)  Campbell has no history of drug or alcohol abuse either.  ([PSR] ¶ 47.)  Campbell is in good health.  ([PSR] ¶ 45.)

Campbell has one biological child who is 23 years of age and the young man is gainfully employed.  ([PSR] ¶ 44.)  Campbell has a "very close" relationship with his adult son.  ([PSR] ¶ 44.)  Campbell has two stepchildren, and those boys (ages 7 and 10) reside with Campbell and his present wife, the boys' mother.  ([PSR] ¶ 44.)

Campbell graduated high school and attended community college where he earned a 3.49 grade point average for about a semester of work.  ([PSR] ¶ 48.)  He left college, and from 1989 until 2009, Campbell worked at Ameritas, a national company, selling insurance and investments.  ([PSR] ¶ 50.)  In 2006 and 2007, Campbell reported gross income of about $75,000 per year on his tax returns.  ([PSR] ¶ 53.)  He lost his job at Ameritas because of these charges, and he now works at his father's business, Campbell's Kitchen Cabinets.  ([PSR] ¶ 49.)

Campbell has assets of $224,000, liabilities of $184,300, including a loan of $50,000 from his father, and a net worth of about $40,000.  ([PSR] ¶ 52.)  Campbell's wife also works at Campbell's Kitchen Cabinets, and between them they earn about $5,500 per month.  ([PSR] ¶ 52.)  Excluding payments on the large loan to Campbell's father, and considering only minimal payments on their large credit card debt, the couple has total monthly expenses of $2,355.  ([PSR] ¶ 52.)  Thus, their net monthly cash flow is $3,134.  ([PSR] ¶ 52.)  Campbell objects to this cash-flow analysis.  I tentatively overrule that objection.  Even though I agree that the cash-flow analysis is

-14-

overstated, I am firmly convinced that Campbell has the ability to pay the $7,500 fine that I propose to impose, particularly because he will have five years to pay it.

Without objection, the evidence includes various letters that are pertinent to the exercise of my discretion. *See* 18 U.S.C. § 3553(a)(1). These letters paint a fuller picture of Campbell. In particular, they describe a good man who made a bad mistake and the harm that Campbell's stable and fully functional family will suffer if I put him in prison. In addition, the letters show that Campbell's stepson, who suffers from Asperger's Disorder, has established a close relationship with Campbell and is dependent upon him. (See Ex. 101.)

Without intending any criticism of the government and the excellent Assistant United States Attorney who has prosecuted this case, the government has elected to base its sentencing position on the PSR and the underlying investigative documents. In particular, the government has not sought to have Campbell examined by a psychiatrist, psychologist or other mental health practitioner.

## II. ANALYSIS

Before proceeding further, I will explain what I understand my obligation to be under the Supreme Court's recent sentencing jurisprudence.[17] To do so, I rely upon the Supreme Court's review of a probationary sentence. *See Gall v. United States*, 552 U.S. 38 (2007) (decision to impose sentence of probation on defendant who had voluntarily withdrawn from conspiracy to distribute the controlled substance "ecstasy" in order to live a law-abiding life years before he was charged with any misconduct

---

[17]I have been sharply critical of the Supreme Court's sentencing jurisprudence—a jurisprudence that does not permit or require me to give the Guidelines substantial weight as compared to the other factors. But, I am bound to follow the Court's direction whether I agree with it or not. I intend to do so to the best of my ability.

was not an abuse of discretion).  In that case, the Supreme Court articulated what my responsibility is in this case:

> As we explained in *Rita*, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.  The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, he may not presume that the Guidelines range is reasonable.  He must make an individualized assessment based on the facts presented.  If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.  We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one.  After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.

> *Id.* at 49-50 (footnotes & citations omitted).

I also take this opportunity to address one of the government's most forceful arguments; that is, the government argues that I must not vary because the Guidelines have already considered the universe of relevant considerations.  In *United States v. Chase*, 560 F.3d 828 (8th Cir. 2009), the Eighth Circuit Court of Appeals stated that "[f]actors ordinarily considered irrelevant in calculating the advisory guideline range, or in determining whether a guideline departure is warranted, can be relevant in deciding whether to grant a variance."  *Chase*, 560 F.3d at 830 (reversing and remanding where district court refused to vary due to health reasons and improperly equated a downward departure with a downward variance).  The Court further stated

-16-

that "factors that have already been taken into account in calculating the advisory guideline range . . . can nevertheless form the basis of a variance." *Id.* at 831.

Thus, to the extent that the government asserts that I cannot (or should not) vary based upon factors that the Guidelines have considered, I reject that assertion as not being the law. In doing so, I reiterate what the Supreme Court has said and that is: "[T]he Guidelines are only one of the factors to consider when imposing sentence, *and § 3553(a)(3) directs the judge to consider sentences other than imprisonment.*" *Gall,* 552 U.S. at 59 (emphasis added).

To sum up, then, I must properly calculate and then consider the Guidelines. I must also consider the other factors found in 18 U.S.C. § 3553(a). Realizing that the Guidelines are no more important than other factors, I must select an appropriate sentence within the meaning of section 3553(a) for this specific defendant and the specific offense he committed. After that, I must explain myself in such a way that the appellate court has a basis for determining whether my decision withstands reasoned, but deferential, scrutiny. I should give particular attention to the notion that a major variance should be supported by a more significant justification than a minor one.

With the foregoing stated, I next proceed to explain the "nitty-gritty" of why a probationary sentence for this specific defendant and this specific offense is appropriate. I start with the Guidelines. After that, I apply the relevant statutory factors. Then, I address the government's specific objections.

*Guidelines Calculations*

I tentatively accept the Guidelines calculations in the presentence report, and tentatively overrule Campbell's objections thereto. In particular, I find and conclude that the Guidelines range for imprisonment purposes is 41 to 51 months in prison.

-17-

However, I acknowledge that the enhancements for use of a computer and for the number of images ratchet up the prison time to such a degree that one begins to think that the child pornography Guidelines as presently constituted detract from the "not greater than necessary" statutory goal of sentencing. *See*, *e.g.*, Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* 28-30 (Jan. 1, 2009)[18] (pointing out a 683% increase in the low end of the applicable Guidelines range for child pornography possession cases following Congressional intervention and over objections by the Sentencing Commission). Nonetheless, I find it inadvisable to use this unique case as a platform to launch an attack on the child pornography Guidelines. Prudence counsels that I rely upon the Guidelines as promulgated while using my new-found discretion as an antidote to the potential ills that may infect them.

One other point should be made. In determining an appropriate sentence, "the district court ordinarily should determine first the appropriate guideline range, then decide if the guidelines permit a traditional departure, and finally determine whether the § 3553(a) factors justify a variance from this 'guidelines sentence.'" *United States v. Miller*, 479 F.3d 984, 986 (8th Cir. 2007) (citing *United States v. Haack*, 403 F.3d 997, 1002-03 (8th Cir. 2005)). "'Departure' is a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines." *Irizarry v. United States*, 553 U.S. 708, ___, 128 S. Ct. 2198, 2202 (2008). A variance, on the other hand, is a "non-Guidelines sentence[] based on the factors enumerated in 18 U.S.C. § 3553(a)." *United States v. Solis-Bermudez*, 501 F.3d 882, 884 (8th Cir. 2007). However, in this case, Campbell does not seek, and the parties have not argued or briefed the propriety of, a departure (despite the way his motion was docketed). Rather, he seeks a variance. (Filing 80 ("Motion for Deviation/Variance From Advisory Sentencing Guidelines").) Therefore, I assume,

---

[18]Available at www.fd.org/pdf_lib/child%20porn%20july%20revision.pdf.

-18-

without deciding, that a traditional departure under the Guidelines would not be warranted.

*Section 3553(a) Factors*

18 U.S.C. § 3553(a) lists seven factors that I am required to consider. I have considered each and all of them and tentatively conclude that a probationary sentence is "sufficient, but not greater than necessary, to comply with"[19] paragraph two of section 3553(a). I briefly discuss the most pertinent factors next.

As for "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), the description I have heretofore set out provides the details of this serious crime. The following additional observations are in order.

In the huge majority of the cases, federal child pornography prosecutions nationwide involve children under the age of 12. *See* Mark Motivans & Tracey Kyckelhahn, *Federal Prosecution of Child Sex Exploitation Offenders, 2006*, Bureau Just. Stat. Bull. 1, 6 (Dec. 2007) (of child pornography defendants sentenced in 2006, "[n]inety-five percent were sentenced for materials depicting a minor under age 12 . . . ."). If one drills down even further, and looks at possession cases only, one will find the same thing. In about 94 out of 100 federal cases involving possession of child pornography (as opposed to ostensibly more serious crimes like receipt or distribution), the victimized child will be under the age of 12. *See* United States Sentencing Commission, *Use of Guidelines and Specific Offense Characteristics: FY 2006* at 35 (Table; U.S.S.G. § 2G2.4 "Possession of Pornography," cell for "Minor under the age of 12 depicted (2 levels)" and "93.5" percent). In other words, Campbell's crime is

---

[19]There is a tinge of irony to this quotation. In the past, I have poked fun at these words because I thought them meaningless. I continue to have difficulty understanding what exactly is intended by this verbiage, but I will do the best I can with what I have been given by Congress and the Supreme Court.

within a minuscule minority of child pornography possession cases prosecuted in federal court.  Therefore, and without question, this case is, as a statistical matter, outside the norm for cases encompassed by the relevant Guidelines.  More simply put, Campbell's case is uncommon because it does not involve  depictions of the most vulnerable.

Qualitatively, after serving more than 23 years as a federal judge, and more than 18 years as a district judge, I find and conclude that the images in this case are far less harmful to the teenage victims than the normal images seen in most other child pornography cases.  Teenage girls can recover from being photographed dancing around in the nude, revealing their breasts and genitalia, while being photographed.[20]  In contrast, where teenage girls are photographed engaging in sexual intercourse, fellatio, cunnilingus, masturbation, sadism, masochism, bestiality and the like, the harm is likely to be far more severe and, in many cases, never-ending.  The foregoing findings and conclusions are self-evident.  I don't need a "shrink" to tell me so.  My experience as a 63-year-old man, a single parent of young teenage girls[21] and my

---

[20]Witness the rash of "sexting" by teenagers that some courts have clothed with Constitutional protections.  *See*, *e.g.*, *Miller v. Mitchell*, 598 F.3d 139, 143 (3rd Cir. 2010) (observing that "[i]n October 2008, school officials . . . discovered photographs of semi-nude and nude teenage girls, many of whom were enrolled in their district, on several students' cell phones" and affirming injunction against local prosecutor who had required the students to attend an education program in order to avoid prosecution).  I do *not* suggest that commercial pornographers and teenagers who "sext" are equally culpable.  I *do* suggest that it is useful to compare the images produced by each to understand the relative harm to those who are pictured.

[21]In 1986, after their mother (my wife) died unexpectedly, I raised two girls (and their brother) as a single parent.  My daughters were respectively 11 and 14 years of age.  For more than five years I was a single parent until their stepmother, my second wife, joined us.  Consequently, I know from personal experience that young girls are especially vulnerable.  As I consider this case, my daughters, and now my new granddaughter, are in my thoughts (and heart).  I may be wrong, but I am not inexperienced regarding, or insensitive to, the plight of young, teenage girls.

experience as a judge who has dealt with a steady diet of child pornography cases and many other criminal cases revealing the worst about mankind is surely enough.

In sum, this case involves a real nasty crime, but the harm to the victims occasioned by the defendant's conduct[22] is much less than in otherwise similar cases covered by the Guidelines.  When applying the Guidelines and the statutory goals of sentencing, I should consider a lesser harm to the victim just as I would consider a greater harm, and that is true even if the Guidelines already take the general issue of harm into account.  *See*, *e.g.*, *United States v. Lounsbury*, No. 09-3058, 2010 WL 2925727 (8th Cir. July 28, 2010) (affirming my decision in mail fraud case to vary upward more than twice the top end of the Guidelines with resulting prison sentence of 72 months where the defendant had no criminal history but the vulnerable victim had been unusually harmed) (citing *Chase*, 560 F.3d at 830, for the propositions that (a) factors ordinarily considered irrelevant in calculating the advisory Guidelines range can form the basis for a variance and (b) factors that have already been considered by the Guidelines can nevertheless form the basis for a variance).

Regarding the "characteristics of the defendant," 18 U.S.C. § 3553(a)(1), I have also previously described those facts in detail.  For this purpose, it is sufficient to state that (1) the defendant has lived an otherwise exemplary life and is by all accounts a good, honest and hard-working man who has apparently learned his lesson, he is not suffering from drug or alcohol abuse or any mental health problem and he poses no danger for "hands-on" abuse of children; (2) Campbell's stable and fully functional family will be harmed if I put him in prison; and (3) although the evidence of his step-

---

[22]The pornographers are an entirely different kettle of fish, not only because they produced and distributed reams of child pornography (including far more harmful images), but also because they apparently took conscious advantage of both parents and children who were probably under dire economic distress.

son's difficulties with Asperger's disorder[23] and the importance of Campbell's role in that child's life would not warrant a traditional departure (as opposed to a variance),[24] there is sufficient reason to conclude that imprisonment of the defendant would be harmful to that child.

Regarding the four factors that the sentence imposed must reflect, 18 U.S.C. § 3553(a)(2)(A)-(D), the following observations are in order. Possession of child pornography is a serious crime that typically justifies a prison sentence in order to promote respect for the law and to impose just punishment, but when the nature of the images and relative harm to the victims are carefully examined, and the defendant's personal characteristics are factored in, a prison sentence would be greater than necessary to promote respect for the law or to justly punish this defendant.

As for the other factors, there is certainly no need to use a prison sentence to adequately deter this defendant, and, insofar as general deterrence is concerned, the relatively harsh probationary sentence that I propose to impose will provide adequate

---

[23]"Asperger's Disorder is a milder variant of Autistic Disorder. Both Asperger's Disorder and Autistic Disorder are . . . subgroups of a larger diagnostic category. This larger category is called either Autistic Spectrum Disorders, mostly in European countries, or Pervasive Developmental Disorders ('PDD'), in the United States. In Asperger's Disorder, affected individuals are characterized by social isolation and eccentric behavior in childhood." *See*, *e.g.*, R. Kaan Ozbayrak, M.D., *Asperger's Disorder Homepage*, www.aspergers.com (click on "What is Asperger's Disorder?"). Children who suffer from this disorder "[l]ike fixed routines" and "[c]hange is hard for them." *See*, *e.g.*, *Autism Spectrum Disorders Health Center*, www.webmd.com/brain/autism/tc/aspergers-syndrome-topic-overview.

[24]*Compare United States v. Bailey, 369 F. Supp. 2d 1090, 1101-02 (D. Neb. 2005)* (granting traditional departure in child pornography case and imposing probationary sentence; stating that departure from advisory Sentencing Guidelines may be warranted when child has serious illness or condition, defendant's presence is critical to child's care and defendant's presence cannot reasonably be duplicated by using other providers).

deterrence for the very few defendants who are similarly situated.[25]  The public need not be protected from further crimes regarding this defendant, as it is highly unlikely that the defendant will engage in additional criminal behavior.  Furthermore, Campbell does not need educational or vocational training, medical care or other correctional treatment and, therefore, a prison sentence would not be warranted to provide such training, care or treatment.

Next, I have considered all the kinds of sentences available to me.  18 U.S.C. § 3553(a)(3).  In particular, I have specifically considered and weighed the relative merits of a prison sentence consistent with the Guidelines, including a standard term of supervised release, a relatively short prison term followed by supervised release and a probationary sentence with community confinement and home confinement components.

As indicated earlier, I am tentatively persuaded that a five-year probationary sentence with up to 120 days of community confinement, to be followed by six months of home confinement under electronic monitoring, a fine of $7,500, 100 hours of community service and rigorous other conditions (*see* particularly U.S.S.G. § 5B1.3(d)(7), p.s.) will best serve the statutory goals of sentencing when all of the available sentences are weighed one against the other.  In this regard, it is worth observing that a probationary sentence potentially gives me more latitude if the defendant violates his conditions of probation as compared to my options if the defendant served a prison sentence and was placed on supervised release and then violated the terms of supervised release.

Crimes, like this one, that carry with them a maximum sentence of less than 25 years while permitting prison sentences of 10 years or more are classified as Class C felonies.  *Compare* 18 U.S.C. § 2252A(a)(5)(B) & (b)(2) (crime of possession and

---

[25]I write more about the general deterrence question when I address the government's argument against a variance.

penalty for crime of possession) *with* 18 U.S.C. § 3559(a)(3) (Class C felony defined). A violation of supervised release for a Class C felony carries a maximum penalty of not more than two years in prison. 18 U.S.C. § 3583(e)(3). A violation of probation, however, would allow me to resentence the defendant to at least the high end of the Guidelines (51 months) and potentially up to 10 years, the statutory maximum. 18 U.S.C. § 3565(a)(2). To be blunt, probation gives me a sledgehammer.

Also, I have fully considered the kinds of sentences and the sentencing range established under the Guidelines. 18 U.S.C. § 3553(a)(4)(A). In this unusual case, I am tentatively persuaded that a Guidelines sentence is far too much. Among other things, I believe the Guidelines fail to give adequate consideration to the nature of the images, the question of relative harm to victims and the personal characteristics of the defendant. This is not surprising inasmuch as this case is truly unusual both statistically and otherwise.

Regarding any pertinent "policy statements" issued by the Sentencing Commission, 18 U.S.C. § 3553(a)(5), I have considered them. Specifically, I have considered the policy statement appearing at U.S.S.G. § 5B1.3(d)(7) regarding conditions of probation for sex offenses. I intend to impose similar conditions in any order of probation.

With respect to "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), I have thought a lot about that question. To be candid, this is the most challenging aspect of this case.

I address this question in greater detail below under the caption "Arguments Against a Variance." But for now, I conclude that (1) very few defendants will have records like Campbell or will have engaged in conduct similar to the conduct that Campbell engaged in when measured either statistically or qualitatively (as discussed more fully above) and thus the concern about disparity is much lessened; (2) if there

are defendants like Campbell, the proposed and relatively harsh probationary sentence will provide adequate deterrence for those few offenders; and (3) for the vast majority of defendants (about 94% of the relevant universe) charged with similar crimes (possession), those offenders will be treated differently than Campbell because there are principled sentencing reasons for doing so.

Finally, with regard to the "need to provide restitution to any victims of the offense," 18 U.S.C. § 3553(a)(7), there are no claims for restitution and the government does not propose that restitution be ordered. Given the geographical location of the victims, and the nature of the international investigation that formed the basis for this prosecution, a restitution order is impossible to fashion no matter what the sentence is that I select.

*Arguments Against a Variance*

The government argues that varying because the images that Campbell purchased on roughly 13 occasions are less disgusting than normal, and for the other reasons I have articulated above, is tantamount to subjecting young teenage girls to continued victimization at the hands of the economically driven predators who produce those images in Eastern Europe. Without a prison sentence, the government continues, there is no real deterrent "for other men" who purchase this bilge; those men create the market demand that the pornographers are all too happy to satisfy; and, further, such an approach will cause unwarranted sentencing disparity. I offer the following thoughts in rebuttal.

Initially, it is highly doubtful that most "other men" prosecuted for child pornography possession of similar images will be "like" Campbell. Whether viewed from the perspective of his total lack of criminal history, or whether viewed from the perspective of Campbell's long and gainful employment history and otherwise law-abiding life, or whether viewed from the perspective that Campbell plays an important part in the life of a child who suffers from Asperger's disorder, or whether viewed

-25-

from the perspective of a man who owned up to his illegal conduct the first time he was visited by law enforcement, or whether viewed from the perspective of a person who took and passed a government polygraph examination indicating that he was answering honestly and was no closet predator, or whether viewed from the perspective of an offender who has been evaluated and found to be at low risk to offend again by a highly trained forensic psychologist holding a doctoral degree and a law degree, the government's argument unravels. In brief, Campbell is not "like" most "other men" in the premise of the government's argument and, as a consequence, most "other men" cannot hope to receive similar leniency and thus the general deterrence and disparity rationales for a prison sentence are much weakened.

Furthermore, even if there are a few "other men" exactly "like" Campbell who possessed images exactly "like" those possessed by Campbell, the fear of a similar prosecution and the consequence of punishment similar to that which I propose to hand out provides adequate general deterrence for that tiny group. No such similar men—knowing what has happened to Campbell and what will happen to Campbell if I proceed to sentence him as indicated—are likely to consider the risk of buying this crap to be a gamble worth taking. Campbell's otherwise commendable life has been ripped apart and nearly destroyed by the perfectly proper prosecution of his criminal conduct. The harsh nature of my proposed probationary sentence adds a significant measure of punishment that will cause similarly situated men to think thrice even without a prison sentence.

Finally, for defendants involved with the more virulent form of images (who form the overwhelming bulk of the cases we see), they are likely to be treated differently even if their personal characteristics are otherwise sympathetic because there are valid sentencing reasons for doing so. I have endeavored to articulate neutral principles for my proposed sentence. The most important of these principles turns on an in-depth assessment of the harm to the victims measured by an objective examination of the images from a statistical and qualitative viewpoint. From that effort, the following principle is derived: As a general rule in child pornography cases,

the lesser the harm to the victim the lesser the sentence, and the greater the harm to the victim the greater the sentence.

In the future, as I have tried to do in the past, I will endeavor to apply the principle of harm to the victim (as well as all other sentencing principles) in an intellectually honest fashion. If I do so, this principle will cut both ways. On a few occasions the principle of harm to the victim will favor leniency, but on most occasions it will favor a prison sentence. Regarding the "camel's nose," the government has little to fear.

### III.  CONCLUSION

I am tentatively inclined to vary and impose a probationary sentence, albeit a harsh one. If I do so, I encourage the government to appeal. It would be helpful to know the thinking of the Court of Appeals.

Lastly, I commend the United States Attorney for the District of Nebraska (Mrs. Gilg), the Assistant United States Attorney (Mr. Russell), the FBI (Special Agent Dougherty), and the Nebraska Highway Patrol (Investigator Jones) for "cutting square corners." I expect and trust them to exercise their powers zealously, but also fairly. Once again, this case proves that my expectations and confidence are well-founded. I am fortunate to serve as a judge in a district where these fine public servants practice their professions.

IT IS ORDERED that:

1.      The parties are advised that I am tentatively inclined to grant the defendant's motion (filing 80) to vary.

2.      I am tentatively persuaded that a five-year probationary sentence with up to 120 days of community confinement, to be followed by six months of home

confinement under electronic monitoring, a fine of $7,500, 100 hours of community service, and rigorous other conditions (*see* particularly U.S.S.G. § 5B1.3(d)(7), p.s.) will best serve the statutory goals of sentencing when all of the available sentences are weighed one against the other.

3.      I will hear counsel's closing arguments before I make a final decision.

August 26, 2010.              BY THE COURT:

                                *Richard G. Kopf*
                                United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.